JS 44 (Rev. 09/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Cameron L. Atkinson

**DEFENDANTS**
FACEBOOK, INC. and MARK ZUCKERBERG

**(b)** County of Residence of First Listed Plaintiff  Litchfield
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Norman A. Pattis, Pattis & Smith, LLC
383 Orange Street, New Haven, Ct  06511
203-393-3017

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. Section 1983 and 47 U.S.C. Section 230
Brief description of cause:
Plaintiff claims violation of his Frist Amendemnt right, violation of Communications Decency Act

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE  11/12/2019
SIGNATURE OF ATTORNEY OF RECORD  *[signature]*

**FOR OFFICE USE ONLY**

RECEIPT #   AMOUNT   APPLYING IFP   JUDGE   MAG. JUDGE

UNITED STATED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CAMERON L. ATKINSON,

    Plaintiff,    :  CV_____

v.

FACEBOOK, INC.,
MARK ZUCKERBERG,
    Defendants.   :  November 12, 2019

## **COMPLAINT**

1. This is an action for money damages and injunctive relief against Facebook, a social media company and personal data harvester, and its founder and current chief executive officer, Mark Zuckerberg. The defendants seek to, and do, have quasi-monopolistic control of a quintessential public communications forum, offering users access to their service free of charge while surreptitiously selling data gathered from the users to third parties for a profit. The defendants enter into adhesion contracts with users, arrogating unto the defendants an opaque right to ban any user for violating the defendants' so-called "community standards." The Plaintiff has been denied the ability to speak publicly on a matter of grave public importance based on the perceived content of the ideas he sought to express. The Plaintiff claims a violation of his rights under the First Amendment to the United States Constitution, violations of the Communications Decency Act, statutory fraud, theft, a breach of the implied warranty of fair dealing, and violations of the Connecticut Unfair Trade Practices Act (CUPTA).

## Jurisdiction

2. The Court properly possesses jurisdiction on both federal question and diversity of citizenship grounds. Venue is appropriate as a substantial part of the events that give rise to the claim occurred in the judicial district of Connecticut. The Claim arises under 42 Section 1983 and 47 U.S.C Section 230.

## Parties

3. The Plaintiff, Cameron L. Atkinson, is an adult resident of New Haven County, Connecticut. At the time of this action being brought, he is a third-year law student at Quinnipiac University School of Law, located in North Haven, Connecticut.

4. Facebook, Inc., is a social media company headquartered in Menlo Park, California. It operates a social media company serving more than 2.3 billion users worldwide.

5. Mark Zuckerberg is the Chairman and Chief Executive Officer of Facebook, Inc., owning a controlling interest in the company's stock. He resides in Palo Alto, California.

## Facebook's Profitable Control of A Quintessential Public Forum

6. As the United States Supreme Court noted in *Packingham v. North Carolina*, 137 U.S. 1735, 1735-36 (2017), Facebook is part of the "vast democratic forum of the Internet." *Packingham* extended the concept of a quintessential public forum from parks and physical spaces to cyberspace.

7. Facebook has a worldwide base of more than 2.3 billion users.

8. More than 7 in 10 Americans have accounts on Facebook. They are not charged for their accounts.

9. Facebook occupies a dominant, quasi-monopolistic position in the global public forum of the Internet, and is one of four American companies dominating Internet traffic together with Google, Apple, and Amazon.

10. Many billions of messages are sent between and among Facebook users each day, taking various forms such as instant messages, timeline posts, and visual stories. Facebook surreptitiously harvest so-called meta-data from each message, building an enormous, and valuable, databank about each user. These databanks are combined, and, with the benefit of massive computing power, Facebook builds predictive models about how Facebook users will respond to various stimuli. Facebook markets this data to third-parties for a profit.

11. Facebook reported gross revenue of $55.8 billion in 2018.

### Facebook Faces Questions About Use of Its Data In The 2016 Presidential Election

12. During the course of the 2016 presidential election, Facebook sold data surreptitiously gathered from users to an entity known as Cambridge Analytica. Upon information and belief, that data was then used by Russian intelligence operatives to attempt to influence American voters.

13. When Facebook's role in gathering and supplying this secretly obtained data became known to the public at large, Facebook faced enormous public pressure to take greater steps to assure privacy and to take a more socially responsible approach to managing content published on its platform and in using the data it harvests.

### Facebook Attempts To Placate Critics By Censoring Speech

14. To assuage an angry public and ultimately to protect its own financial interests, Facebook announced plans to create and enforce so-called "community

standards" for content published on its site. These standards are directed toward speech that Facebook regards as inimical to a "safe environment."

15. Among the content that Facebook finds "objectionable" is bullying and harassment. Facebook does not provide a definition for what bullying or harassment is. However, it does provide a broad definition that may cover almost anything: "Bullying and harassment happen in many places and come in may different forms, from making threats to releasing personally identifiable information, to sending threatening messages, and making unwanted malicious contact."

16. Facebook further elaborates this so-called standard as follows: "We distinguish between public and private individuals because we want to allow discussion, which often includes critical commentary of people who are featured in the news or who have a large public audience. For public figures, we remove attacks that are severe as well as certain attacks where the public figure is directly tagged in the post of comment."

17. The standard is hopelessly vague. As Facebook itself notes, "[c]ontext and intent matter, and we allow people to share and reshare posts if its clear that something was shared in order to condemn or draw attention to bullying and harassment."

18. Facebook reserves the right to remove the "offensive" posts without notifying the user or giving the user an opportunity to clarify or edit his post. Moreover, Facebook reserves the right either temporarily or permanently to disable an account for violation of its "community standards" policy.

19. The process of removing user posts is totally opaque. The manner in which postings are flagged as community standards violations is unknown, and the extent to

which computer algorithms or humans decide which content is objectionable remains unknown.

### **Facebook Censors Cameron L. Atkinson**

20. Like many of his fellow citizens and students of the law, the Plaintiff, Cameron L. Atkinson is a thinker who, regardless of whether he is right or wrong, loves to share his thoughts and hear the thoughts of others. He regularly posts on Facebook about political and legal developments with the same civility that he would use in the courtroom or the classroom, seeking to engage in debate with the community of fellow law students and other friends whose respect he has gained.

21. The Plaintiff, Cameron L. Atkinson, is also an inquiring man who rarely rushes to judgment, often choosing to find out for himself before condemning someone.

22. Consequently, when Cameron L. Atkinson learned from friends that Facebook was censoring conservatives' posts that mentioned the name of Eric Ciaramella, the alleged Ukranian whistleblower who has provided the impetus for the pending impeachment proceedings against President Donald Trump, he decided to test the scope of Facebook's censorship himself.

23. Cameron L. Atkinson's first post occurred on the morning of November 11, 2019. He published a post on Facebook that read "Test post: Eric Ciaramella is a hero for blowing the whistle on the Trump administration's treason with Ukraine." *See* Exhibit 1.

24. Approximately four minutes later, Cameron L. Atkinson published a second test post on Facebook that read "Test post 2: Eric Ciaramella is a dirty lying rat for trying to take down the Trump administration." *See* Exhibit 1.

25. Cameron L. Atkinson's object in publishing these posts was to see if Facebook would censor one post, but not the other.

26. Within 5 hours, Facebook removed both of Cameron L. Atkinson's posts with no warning or notification.

27. After learning of Facebook's censorship, Cameron L. Atkinson published a third post that read as follows:

> I have conflicting thoughts about the naming of Eric Ciaramella, the alleged Ukraine whistleblower. Tattling in the dark shadows destroys public confidence in a matter of serious public interest. On the other hand, the vitriolic nature of our society may very well raise concerns for his safety. However, it may also end up protecting his well-being. Regardless, I think that people should be open to debating the merits of this serious public question.

See Exhibit 2.

28. Again, less than 5 hours later, Facebook removed Cameron L. Atkinson's third post without notifying him or warning him.

29. As of the filing of this complaint, Cameron L. Atkinson has not received a single communication from Facebook as to why his posts have been removed.

30. Facebook's censorship of Cameron L. Atkinson embodies its categorical attempt to pander to and placate its critics. Facebook has elected to apply its vague "community standards" policies in a politically-motivated, ideologically-driven way, silencing both right-wing and left-wing speech that threatens to disrupt the carefully crafted narrative around the attempt to impeach President Donald Trump.

31. The decision to censor Cameron L. Atkinson and the many other concerned citizens who sought to discuss Eric Ciaramella's crucial role in the profound matters of public concern happening in the present moment was undertaken in bad faith. Facebook

is aware or should have been aware that Mollie Hemingway, a Fox News contributor, had already named Eric Ciaramella as the Ukrainian whistleblower in front of a national audience on Fox News.

32. Put into perspective, Cameron L. Atkinson could only immediately reach 664 users (his "friends" list as of this complaint) of Facebook's 2.3 billion users.

33. Cameron L. Atkinson was not bullying or harassing Eric Ciaramella, but rather expressing his concerned views on the affairs of his government.

34. As a direct and proximate result of the acts and omissions of the Defendants, Cameron L. Atkinson has suffered ascertainable loss in that he has been deprived access to express his views in a public forum.

35. Upon information and belief, Mr. Zuckerberg harbors political ambitions beyond his role as principal of Facebook. His decision to categorically censor the speech of concerned citizens including that of Cameron L. Atkinson is intentional and is inspired by ill-will, malice, and a desire to deflect attention from himself and Facebook's practice of surreptitiously mining data for profit from consumers who believe they are receiving a free service devoted primarily to their welfare.

## Communications Decency Act

36. Paragraphs 1 through 35 are incorporated by reference herein.

37. Facebook is a provider of an "interactive computer service" within the meaning of the Communications Decency Act (CDA) of 1996, 47 U.S.C. Section 230, et seq.

38. The Communications Decency Act provides immunity from civil liability for materials published on interactive computer service sites. The provision of immunity was

intended to avoid "content-based" chilling of freedom of speech in the "new and burgeoning Internet medium." Section 230 was enacted, in part, to preserve the robust nature of speech on the Internet. These principles were clearly articulated in *Zeran v. America Online*, Inc., 129 F.3d 327 (4th Cir. 1997), cert. denied, 524 U.S. 937 (1998).

39. Facebook enjoys immunity from suit under Section 230 of the CDA as a Congressionally mandated means of ensuring free and robust speech on the Internet. This privileged status necessarily entails a corresponding responsibility to achieve the very goal for which Congress granted the immunity: to wit, the preservation of free speech on a quintessential public forum.

40. Facebook's enjoyment of immunity from civil liability for the material it transmits on the Internet transforms its editorial decision-making process into management of a constructive public trust.

41. The activities of this constructive public trust require that Facebook operate and manage its content-based decisions in accord with the purposes of the trust.

42. The manner and means by which the defendants have banned the Plaintiff from engaging in free speech on Facebook are a violation of the CDA and constitute a willful and wanton violation of the terms of the constructive public trust.

43. The defendants use and enjoyment of the immunity conferred by the CDA while simultaneously flouting the very purposes for which Congress conferred immunity is unconscionable and is akin to their secret harvesting of user date for sale at a profit to third parties.

## **First Amendment**

44. Paragraphs 1 through 43 are incorporated by reference herein. This claim arises under 42 U.S.C. Section 1983.

45. Facebook's dominant position in control of access to the Internet gives it a quasi-monopolistic power over a quintessential public forum.

46. Facebook actively seeks to expand the reach of this quasi-monopolistic power and hires teams of social psychologists to study how users interact with site, constructing complex algorithms and engaging in sophisticated behavioral modeling so as to maximize the amount of time each user spends on the site.

47. By increasing the amount of time users spend on the site, Facebook acquires more data, and is better able to predict how users will behave in response to stimuli. This data and the associated predictive models are at the core of the Facebook's business plan and are the primary product Facebook sells to advertisers.

48. The CDA's grant of immunity is integral to the government's purpose of promoting freedom of speech on the Internet. As such, the symbiosis between Facebook and the United States government transforms Facebook's action into state action under the doctrine enunciated in *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961).

49. Facebook's symbiotic relationship with the government is further illustrated by Facebook's policy of complying with subpoenas from law-enforcement agencies, but not with subpoenas from private attorneys, even in criminal cases.

50. The defendants' decision to ban the Plaintiff from Facebook is an impermissible content-based abridgement of the plaintiffs' right to freedom of speech under the First Amendment.

51. Facebook's so-called "community standards" policy is overbroad and void for vagueness on its face.

52. Facebook's application of the "community standards" policy in this case is overly broad.

### Fraud

53. Paragraphs 1 through 52 are incorporated by reference herein.

54. The Defendants hold themselves out to the world as fostering a means by which the people of the world can communicate with one another.

55. The Defendants further represent that they will foster communication without censorship of participants based on the content of the participants' ideas and opinions.

56. The Defendants offer the service of interconnection free of charge to participants, but secretly harvest data about each participant, including the sites participants visit, how long participants visit each site, and other highly personal information about the participants.

57. The Defendants analyze and then package the data collected from participants to third parties at enormous profit, without obtaining the informed consent of the participants in any meaningful manner.

58. The Defendants rely upon a vague "community standards" policy as a thinly veiled marketing device, eliminating content deemed unpopular by political parties, parties, and interest groups to which the Defendants intentionally or implicitly support.

59. Upon information and belief, the lobbying of political interest groups, the pressure of politicians, and the intense public pressure of offended citizens is a sufficient

reason for the Defendants to use their "community standards" policy to censor certain speech.

60. The Defendants foster reliance on their service by participants so long as the benefits the Defendants receive from surreptitious data-mining is not outweighed by adverse reaction from the aforementioned actors.

61. The defendants administer their "community standards" policy in a secretive and opaque manner.

62. By holding themselves out to the world as promoters of free expression while simultaneously engaging in selective censorship of certain speech, the Defendants have engaged in fraud.

63. The Defendants engaged in fraud to the detriment of the plaintiffs in the following ways:

   a. The Defendants encouraged and/or solicited the plaintiffs to use Facebook, which led the Plaintiff to build his primary intellectual friendships on Facebook instead of another platform such as LinkedIn or Twitter;

   b. When the Defendants' unscrupulous business practices of data mining user data became the target of public ire, the Defendants sought to remedy their public reputations by categorically censoring speech that offended their critics;

   c. Without warning, Facebook censors the speech of millions of Americans including the Plaintiff, and decides to remove his posts;

  d. The Defendants never provided fair notice, an opportunity to be heard, or a review of any kind to the Plaintiff;

  e. The Defendants' actions were not motivated by any broader concern with public policy, but were instigated by a craven profiteering and marketing strategy which led it to align itself with groups and interests perceived to control a greater market share of the advertising revenue on which it relies.

64. The Defendants' behavior and its fickle manipulation of its "community standards" policy amounts to little more than a bait and switch tactic to allure the Plaintiff to establish and contribute web traffic on its platform, then mined the data that traffic generated to sell for profit, and then censor the Plaintiff's speech when it does not fit the politically correct narrative that the Defendants must perpetuate.

## Connecticut Unfair Trade Practices Act

65. Paragraphs 1 through 65 are incorporated by reference herein.

66. The Defendants' act of holding themselves out to the world as fostering a means by which the people of the world can communicate with one another freely without censorship constitutes an unfair or deceptive act or practice under the Connecticut Unfair Trade Practices Act.

## Implied Warranty of Good Faith and Fair Dealing

67. Paragraphs 1 through 66 are incorporated by reference herein.

68. Facebook and the Plaintiff entered into contracts about the terms and conditions under which the Plaintiff would use Facebook's social media services.

69. The Plaintiff honored the terms and conditions of the contracts.

70.  The Defendants have administered the contracts in an entirely self-serving manner, by changing the terms and conditions of the contracts without notice to the plaintiffs, and by otherwise behaving in an unconscionable manner for purposes of enormous financial gain.

### Damages

71.  Facebook and Mr. Zuckerberg are contemptuous of public oversight of any kind, and regard substantial fines as a simple cost of doing business.

72.  In April 2019, Facebook set aside a sum of $5 billion to use to pay an anticipated fine by the Federal Trade Commission involving systemic breaches of consumer privacy. Even so, the Defendants forecast significant profits.

73.  The Defendants face investigations for breaches of privacy and other regulatory offenses in the European Union under GDPR laws.

74.  Punitive damages in a sum sufficient to make Facebook accountable are necessary.

Wherefore, the Plaintiff seeks damages as follows:

- A. Punitive damages in a sum sufficient to punish and deter Facebook for violating the First Amendment, the Communications Decency Act, for engaging in fraud, unfair or deceptive trade practices, and breaching the implied warranty of fair dealing. Because a sum of $5 billion appears to be insufficient to deter Facebook, the plaintiffs ask the jury for a sum significantly in excess of that amount;
- B. Attorneys' fees and the cost of this action arising under 42 U.S.C. Section 1988 and Connecticut law;

C. Compensatory damages for violating the Plaintiff's First Amendment rights to free speech;

## JURY CLAIM

The Plaintiff claims trial by jury.
The Plaintiff

_____
Norman A. Pattis, No. CT13120
Pattis & Smith, LLC
383 Orange Street, 1st Fl.
New Haven, CT 06511
npattis@pattisandsmith.com
Tel: 203-393-3017
Fax: 203-393-9745

# Exhibit 1

Eric Ciaramella is a dirty lying rat for trying to take down the Trump administration.



**Cameron Atkinson**
Just now ·

Test post 2:

Eric Ciaramella is a dirty lying rat for trying to take down the Trump administration.

 Like     Comment     Share



**Cameron Atkinson**
4 mins ·

Test post:

Eric Ciaramella is a hero for blowing the whistle on the Trump administration's treason with Ukraine.

 Like     Comment     Share



**Cameron Atkinson**
Saturday at 11:38 PM ·

vicious...

# Exhibit 2

 Live  Photo  Check In



Add to Story



 **Cameron Atkinson**
Just now ·

I have conflicting thoughts about the naming of Eric Ciaramella, the alleged Ukraine whistleblower. Tattling in the dark shadows destroys public confidence in a matter of serious public interest. On the other hand, the vitriolic nature of our society may very well raise concerns for his safety. However, it may also end up protecting his well-being. Regardless, I think that people should be open to debating the merits of this serious public question.

👍 Like     Comment     Share