## UNITED STATED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CAMERON L. ATKINSON, | : | |
| | : | |
| Plaintiff, | : | 3:19-CV-01785-JCH |
| | : | |
| v. | : | |
| | : | |
| FACEBOOK, INC., | : | |
| MARK ZUCKERBERG, | : | |
| Defendants. | : | March 16, 2020 |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS

The Plaintiff, Cameron L. Atkinson, respectfully requests the Court to deny the Defendants' motion to dismiss his claims for the reasons set forth within.

This case represents a classic example of what happens when a meddling and bumbling government seeks to promote a public policy objective that ostensibly protects freedom. The result is the aggregation of power to an elite class who masquerade under noble ideals about protecting liberty, but who turn to selfishly pursuing their self-interests with no regard for the false trust placed in them by a bumbling government.

Since the inception of Facebook, the Defendants, Facebook, Inc. and Mark Zuckerberg, have held themselves out to the world as champions of free speech. They neglected to add the qualifier to that representation. They are only champions of free speech as long as it protects their wallets. For them, free speech yields to money and any form of political pressure that officious intermeddlers in a bumbling government can bring to bear on them. In the process, they have neglected their obligations – both under the laws that a bumbling government enacted to place trust in them and under their contract with the Plaintiff, Mr. Atkinson.

Now that the Defendants have been called out on their duplicity, they seek any and every escape to avoid being held accountable. The law does not allow them to escape, and the Court should deny their motion to dismiss for the reasons stated herein.

## BACKGROUND

In the aftermath of the 2016 presidential election, it came to light that the Defendants were surreptitiously gathering data from their users and selling them to Russian intelligence operatives who were then using the information to influence American voters. Compl. ¶ 12. The subsequent outrage from the general public and members of the United States government as well as the threat of increased government regulation compelled the Defendants to create and enforce "community standards" to regulate content published on their platform. Compl. ¶ 14. The Defendants subsequently crafted a hopelessly vague standard to censor speech on their platform. Compl. ¶ 14-19.

On or about November 11, 2019, the Plaintiff, Cameron L. Atkinson, learned that Facebook was censoring political conservatives' posts that mentioned the name of Eric Ciaramella, the alleged Ukranian whistleblower. Compl. ¶ 22-23. He decided to find out the truth of the censorship for himself, and he made two initial posts to test it – one praising Mr. Ciaramella as a hero and the other branding him as a "dirty lying rat." Compl. ¶ 22-24. Mr. Atkinson's first two posts were clearly labelled "Test post" and "Test post 2." Compl. ¶ 23-24. Within five hours, the Defendants removed both of Mr. Atkinson's posts with no warning or notification that they had done so. Compl. ¶ 26. Mr. Atkinson subsequently published a third post expressing his true sentiments regarding Mr. Ciaramella, and the Defendants also removed that post within five hours without warning or notification that they had done so. Compl. ¶ 27-28.

As a result of the Defendants' censorship, Mr. Atkinson has brought claims against the Defendants for violations of his rights under the First Amendment to the United States Constitution, violations of the Communications Decency Act, fraud, a breach of the implied warranty of fair dealing, and violations of the Connecticut Unfair Trade Practices Act (CUPTA).

## Argument

A plaintiff must plead "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, the plain statement must allege sufficient facts to state a plausible claim for relief. *Monger v. Connecticut Dept. of Transportation*, 2017 WL 3996393, at *2 (D. Conn., Sept. 11, 2017) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at *2 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (internal quotations omitted). This plausibility standard does not require a probability analysis, but it also is not met by "'a sheer possibility that a defendant has acted unlawfully' or by facts that are 'merely consistent with a defendant's liability.'" *Id.* at *2 (quoting *Iqbal*, 556 U.S. at 678).

For purposes of deciding a Rule 12(b)(6) motion, "the court must accept all material factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Id.* at *2 (citing *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 5 (2010); *Jaghory v. N.Y. State Dept. of Education*, 131 F.3d 326, 329 (2d Cir. 1997)). However,

this does not require the court to "accept as true a 'legal conclusion couched as a factual allegation.'" *Id.* at *2 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

**I.   THE COURT SHOULD NOT DISMISS MR. ATKINSON'S FIRST AMENDMENT CLAIM BECAUSE THE PUBLIC FUNCTION EXCEPTION & THE ENTWINEMENT EXCEPTION TO THE STATE ACTION DOCTRINE BOTH APPLY.**

As an initial matter, Mr. Atkinson does not dispute that the First Amendment traditionally applies only to state action unless it falls into one of the Supreme Court's exceptions to the state action doctrine. Mr. Atkinson contends that two exceptions apply here: the public function exception and the entwinement exception. These two exceptions weigh against the Court dismissing Mr. Atkinson's First Amendment claim.

**A. Social Networks Such As the Defendants' Closely Resemble The Public Spaces That The Supreme Court Has Chosen To Protect Through the Public Function Exception And The Public Forum Doctrine.**

In *Marsh v. Alabama*, the Supreme Court reversed the trespass conviction of a Jehovah's Witness for distributing religious literature on the premises of a company town. 326 U.S. 501, 503-04 (1946). The Supreme Court held that the private property rights of the company did not "justify the State's permitting a corporation to govern a community of citizens so as to restrict their fundamental liberties…." *Id.* at 509. The *Marsh* Court's holding was based on three rationales. First, the Court found that the company town was no different from any other public town "except [for] the fact that the title to the property belong[ed] to a private corporation," thus implying that a private company could conceivably possess the power to undermine freedom as effectively as a government could. *Id.* at 503. Second, the *Marsh* Court rationalized that the town was freely accessible by the public, thus serving a public function of the kind traditionally served by a government. *Id.* at 503-506 ("The more an owner, for his advantage, opens up his

property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it"). Third, the *Marsh* Court found that applying First Amendment rights against a private company was necessary because, at the time, "[m]any people in the United States live[d] in company-owned towns," and "to act as good citizens they must be informed," and "[i]n order to enable them to be properly informed their information must be uncensored." *Id.* at 508.

The Supreme Court since has significantly narrowed *Marsh*. In *Jackson v. Metro Edison Co.*, the Court limited *Marsh*'s application to public functions that are both "traditionally" and "exclusively" provided by the State. 419 U.S. 345, 352 (1974). These traditional and exclusive public functions appear to be now limited to "bridges, ferries, turnpikes and railroads," *Marsh*, 326 U.S. at 506; operating public parks, *Evans v. Newton*, 382 U.S. 296, 301-302 (1966); or providing for education, fire and police protection, and tax collection, *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 163-64 (1978).

Under the narrower version of *Marsh*, the Defendants' social network, Facebook, can still be viewed, and should be viewed, as a state actor. Social networks such as Facebook do serve an important public function: providing a space with the primary purpose of serving as a forum for public communication and expression[1], designating that

---

[1] Communications on social network websites such as Facebook are not necessarily fully public as Facebook offers users the ability to limit who is able to receive particular messages, as well as the ability to send private messages, and listeners can choose from whom they wish to hear. However, public town spaces are often no different. No one would fail to label a town square as a "public place" just because an individual walking in the square could choose to ignore a speech being made there, or because that individual was able to have a private conversation with another individual in the square.

space for that purpose, and completely opening that space to the public[2]. In other words, social network websites are akin to public squares and meeting places. Indeed, unlike the shopping malls in the now-reversed *Amalgamated Food Emps. Union Local 590 v. Logan Valley Plaza*, 391 U.S. 308, 325 (1968) and its progeny, which were dedicated primarily to shopping and commerce instead of being a forum for speech, social networks are designed and designated for communication and speech just like town squares traditionally were.

Governments traditionally and always managed public squares and meeting places; therefore, under *Marsh*'s rationale even in its narrowed context, social networks such as Facebook fulfill a public function that traditionally has been the sole province of the state, and it gives Facebook a quasi-monopolistic and exclusive control. Compl. ¶ 46. The sheer size of the public square maintained by Facebook is unparalleled in human history. In the past, only government were able to offer spaces that could accommodate tremendous numbers of people even though their efforts now pale in comparison to social media networks. Consequently, social media networks serve a function previously fulfilled exclusively by the government.

**B. Mr. Atkinson Has Alleged An Entwinement Between The Defendants And The United States Government Sufficient To Invoke The Entwinement Exception To The State Action Doctrine.**

---

[2] *See Marsh*, 326 U.S. at 506 ("The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it.").

A non-state actor may be deemed a state actor "because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937 (1982); *see also Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (citation omitted) ("[S]tate action may be found ... only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'"); *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 724 (1961). Therefore, "private conduct must comply with the Constitution if the government has authorized, encouraged, or facilitated the unconstitutional conduct." Erwin Chemerinsky, Constitutional Law 519-21 (4th ed. 2011).

As an initial matter, Mr. Atkinson has alleged that the Defendants faced enormous pressure from members of the United States government in the aftermath of the 2016 presidential election to engage in content-based censorship of political speech. Compl. ¶¶ 13-14. This pressure from members of the United States government extended to carefully crafting and perpetuating a narrative regarding the impeachment of President Donald Trump, which resulted in the content-based censorship of a wide range of political viewpoints at the behest of members of the United States government. Compl. ¶¶ 22, 30. Mr. Atkinson is unsure of every form that government influence was brought to bear on the Defendants to engage in content-based censorship, but he is very sure of the repeated times that Mr. Zuckerberg and Facebook officials testified in front of Congress and faced public threats to curtail their immunity against civil liability for the publication of speech. Consequently, Mr. Atkinson has alleged sufficient facts to make at least an initial

showing that the Defendants have become impermissibly entwined with the government and enable his First Amendment claim to survive.

## II.   47 U.S.C. § 230 CREATES A CONSTRUCTIVE PUBLIC TRUST REQUIRING THE DEFENDANTS TO ALIGN WITH THE GOVERNMENT'S OBJECTIVE IN PROMOTING FREE SPEECH ON THE INTERNET IN EXCHANGE FOR IMMUNITY.

No one owns the Internet, and no single person or organization can control the internet in its entirety. *See* 47 U.S.C. § 230(a)-(b) (describing the internet as a separate concept from interactive computer services); *Zeran v. America Online, Inc.*, 129 F.3d 327, 328 (4th Cir. 1997) ("The Internet is an international network of interconnected computers…. *Reno v. ACLU*, 521 U.S. 844, 849 (1997)."). Nevertheless, the United States government as well as governments around the world have recognized the need to ensure integrity in the internet and maintain its orderly operation to enable public access. Consequently, prior to 1998 and in recognition of the internet as an infinite public resource, the United States government itself maintained the domain name system (DNS). *See Memorandum of Understanding Between the U.S. Dep't of Commerce and Internet Corp. for Assigned Names and Numbers* ("MOU"), https://www.ntia.doc.gov/page/1998/memorandum-understanding-between-us-department-commerce-and-internet-corporation-assigned- (Nov. 25, 1998).[3] In 1998, the Department of Commerce formally recognized the Internet Corporation for Assigned Names and Numbers (ICANN) as the official non-profit to privately manage access to the Internet through the domain name system under government supervision. *Id*.; *see also Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 414 (2d Cir. 2004). The Internet cannot

---

[3] The MOU is attached as "**Exhibit B**" for the Court's convenience.

function without the DNS, which brings order to the Internet as sort of a global phone directory. Consequently, even though the Department of Commerce almost wholly removed itself from supervising ICANN in 2016, it did not surrender control or regulation of the DNS to a private company but to a multi-stakeholder organization with participants from around the globe.

Consequently, the government's actions have clearly been to recognize and perpetuate the concept of the Internet being a global public resource. To preserve access to the Internet as a public resource, the United States government took steps to protect companies who offered services that make it easy for people to access the Internet, namely, preempting, through 47 U.S.C. § 230, state law that would hold them liable for the general public's speech. However, in doing so, the government recognized the important features of the Internet that make it a public resource: (1) the increased availability of educational and informational resources; (2) the degree of control over information that users received; and (3) its value as a forum for truly diverse political discourse, cultural development, and countless other opportunities for intellectual activity. 47 U.S.C. § 230(a). The government then stated that its policy in providing immunity was to promote the continued development of these features. 47 U.S.C. § 230(b)(1). This connection makes it plainly evident that the government did not intend to extend costless immunity to anyone.

If the government did not extend costless immunity, what did it do? The government's provision of immunity to interactive computer service providers such as Facebook creates a constructive public trust between the government and interactive computer service providers such as the Defendants.

The public trust doctrine traces its lineage back to the Byzantine Empire's Justinian Code, and its primary use has been in natural resources. Charles F. Wilkinson, The Headwaters of the Public Trust: Some of the Traditional Doctrine, 19 Envtl. L. 425, 458-62 (1989). Its appearance in American law came in colonial ordinances that preserved the public's right to access the ocean for various purposes. However, early American law did not specifically limit the public trust doctrine to natural resources. *See, e.g.*, *Arnold v. Mundy*, 6 N.J.L. 1, 49 (N.J. Super. Ct. 1821) ("Every thing susceptible of property is considered as belonging to the nation that possesses the country, and as forming the entire mass of its wealth.").  Things that did not fall under individual property rights belonged to the nation, and were called public property. *Id.* The early doctrine then drew a distinction between the property of the state and common property:

> Of these, again, some are reserved for the necessities of the state, and are used for the public benefit, and those are called 'the domain of the crown or of the republic'; others remain common to all the citizens, who take of them and use them, each according to his necessities, and according to the laws which regulate their use, and are called common property.

*Id.* at 49. Natural resources fell into the category of common property, and early American courts did not elaborate on the property of the state. *Id.* at 49.

The Supreme Court adopted the public trust doctrine and elaborated on the property of the state in *Illinois Central Railroad v. Illinois* in describing underwater lands comprising the entire Chicago waterfront:

> But it is a title different in character from that which the State holds in lands intended for sale. It is different from the title which the United States hold in the public lands which are open to preemption and sale. It is a title held in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties.

146 U.S. 387, 452 (1892).

There has been little to no evolution from the public trust doctrine articulated by *Illinois Central*. However, the principle is clear. There are some resources that the government must take charge of in order to allow its citizens to benefit from. The Internet is one of those resources, and the government's historical involvement in its development has indicated its recognition of its responsibility to safeguard citizens' rights to access it. At the same time, the government realized that its citizens could not access the resource known as the Internet without assistance, which is why it enacted 47 U.S.C. § 230 to encourage that private parties to facilitate access to the internet.

The exchange of immunity for access facilitation does not function as an enabling tool, but rather as a protective one for all citizens. The government's interest is to prevent a certain select number of citizens from shutting down access to the Internet at the expense of all other citizens. Consequently, it immunized interactive service providers from liability for acts that they do not commit - namely, creation of content and the restriction of access to obscene material - to ensure the development of access to the Internet. 47 U.S.C. § 230(c). At the same time, the government emphasized that the importance of this immunity was to enable interactive service providers to facilitate access to the internet in order to promote the tremendous importance of free speech and the Internet's vast potential for the communication of information. 47 U.S.C. § 230(a). Consequently, the extension of immunity cannot not be decoupled from the government's objective in promoting public access to the internet to engage in free speech, thus creating a constructive public trust.

While 47 U.S.C. § 230(c)(2) does give the Defendants license to censor material that is "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise

objectionable, whether or not such material is constitutionally protected…," it does not give them carte blanche to censor political speech simply because they disagree with it and are intent on perpetuating their own political narrative. The Defendants' actions, as alleged, have encroached on the purposes of granting the immunity and have violated the constructive public trust established by 47 U.S.C. § 230(c)(2). Consequently, the Court should deny to dismiss Mr. Atkinson's claim under the Communications Decency Act.

III.    **EVEN IF THE COMMUNICATION DECENCY ACT DOES NOT ESTABLISH A CONSTRUCTIVE PUBLIC TRUST, THE COMMUNICATIONS DECENCY ACT DOES NOT PRECLUDE THE PLAINTIFF'S STATE LAW CLAIMS BECAUSE THE DEFENDANTS DID NOT ACT IN GOOD FAITH OR VOLUNTARILY.**

The Defendants' total reliance on § 230(c) of the Communications Decency Act (47 U.S.C. § 230(c)) blindly assumes that they have no obligations under it, which explains, at least in part, their total disregard for its requirements. First, § 230(c) immunity is an affirmative defense, which Mr. Atkinson is not required to prospectively negate in his complaint. *See e-ventures Worldwide, LLC v. Google, Inc.*, 188 F. Supp. 3d. 1265, 1273 (M.D. Fla. 2016). Second, § 230 specifically allows state law claims that are not inconsistent with the rest of § 230. 47 U.S.C. § 230(e)(3).

The Defendants' headlong rush to the courthouse exit fails to consider the plain language of § 230(c)(2), which reads as follows:

> No provider or user of an interactive computer service shall be held liable on account of – (A) any action *voluntarily taken in good faith* to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected….

47 U.S.C. § 230(c)(2) (emphasis added).

The statutory immunity provided under § 230 "does not apply without limitation." *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006). If it is readily apparent from the face of a complaint that a plaintiff has pled no claims or facts supporting an allegation of a lack of good faith, a defendant may invoke § 230 immunity during a motion to dismiss. *e-ventures Worldwide, LLC,* 188 F. Supp. 3d. at 1273. However, if a plaintiff pleads a lack of good faith and sufficient factual allegations to support a lack of good faith, § 230 immunity does not apply at the motion to dismiss stage. *Id.* at 1273; *see also Smith v. Trusted Universal Standards in Electronic Transactions, Inc.*, 2010 WL 1799456 (D.N.J. May 4, 2010).

Mr. Atkinson has alleged that the Defendants have not acted voluntarily or in good faith, and he has alleged sufficient facts to support such an allegation as well. Compl. ¶ 31 ("The decision to censor Cameron L. Atkinson and the many other concerned citizens who sought to discuss Eric Ciaramella's crucial role in the profound matters of public concern happening in the present moment was undertaken in bad faith"). Consequently, 47 U.S.C. § 230(c)(2) provides the Defendants with no easy exit, and the Court should deny their motion to dismiss Mr. Atkinson's state law claims as being preempted by 47 U.S.C. § 230(c)(2).

### A. The Defendants Have Not Acted Voluntarily In Choosing To Censor Mr. Atkinson.

The Defendants, and Mr. Zuckerberg in particular, have held themselves out as the champions of free speech and free communication; however, even Ephialtes of Trachis would be a more preferable champion than the Defendants when blind outrage and sinister political agendas communicated through exploitive political talking points bring pressure on the Defendants to censor speech. The Defendants wilted at the first

sign of this politically motivated pressure, and, instead of trusting in the free speech principles that they purported to defend, they abandoned them to pander to political agendas hell-bent on curbing undesirable political speech. The result of the Defendants' pandering was the creation of broad and vague "community standards." Compl. at ¶¶ 14-19.

In his complaint, Mr. Atkinson alleges that the Defendants did not voluntarily abandon their "championing" of free speech and their prior antipathy toward censorship on Facebook, but rather were compelled to establish policies – the same policies used to censor Mr. Atkinson – enabling opaque and selective, content-based censorship. *See* Compl. ¶¶ 13-14. This compulsion came from an angry public and was voiced through their representatives in the federal government in the aftermath of the 2016 presidential election. Compl. ¶¶ 12-13. Ironically, the Defendants brought this compelling pressure upon themselves by surreptitiously gathering data from their users and selling that data to Russian intelligence operatives. Compl. ¶¶ 12-13. Consequently, Mr. Atkinson does allege that the Defendants' revised community standards were not voluntary, but were compelled by the threat of government regulation and public outrage. Compl. ¶¶ 13-14. He alleges those revised community standards were used to censor his posts regarding Eric Ciaramella, the alleged Ukraine whistleblower. Compl. ¶¶ 20-35. On that basis alone, Mr. Atkinson is entitled to prove that allegation in a court of law by § 230(c) of the Communications Decency Act.

The Defendants' craven surrender to compulsion does not cease with their total capitulation on revising their community standards. The Defendants intentionally crafted a "hopelessly vague" set of community standards, ostensibly to give themselves breathing

space to censor at will. Compl. ¶¶ 14-17. The result, intentional or unintentional, is that the Defendants do not make voluntary censorship decisions based on objective standards, but involuntary censorship "decisions" compelled by the subjective sensibilities and perceived threats of a fickle public or a political agenda.

The Defendants' categorical censorship of any content mentioning Eric Ciaramella's name did not come about because the Defendants made a voluntary and objective decision that the mention of his name was inappropriate. Rather, the Defendants were compelled to accept, by public and government pressure, that the mistaken view that 5 U.S.C. § 7(b) prevents public discussion of a whistleblower by name even if his name becomes public knowledge.[4] *See* Dkt. 18, p. 2. They were also compelled by their critics, both in the public at large and government officials, to accept the view that the mention of Eric Ciaramella's name would result in his imminent death or harm at the hands of President Donald Trump or a bunch of society's deranged maniacs. Compl. ¶ 30.

Mr. Atkinson alleges that the Defendants' actions were not voluntary, but rather an attempt to placate their critics – both in the public at large and in the government –, and avoid disastrous financial and regulatory consequences, and to deflect attention from the Defendants' practice of surreptitiously mining consumer data for profit. Compl. ¶ 35. Consequently, considered in its totality, Mr. Atkinson has alleged sufficient facts to show that the Defendants did not voluntarily censor his speech, and the Court should deny the Defendants' motion to dismiss his state law claims as precluded by 47 U.S.C. § 230(c).

---

[4] Ironically, the Defendants now conduct an exercise in hypocrisy by seeking to argue that the First Amendment cannot apply to private conduct while arguing a federal statute restraining a government official somehow restrains private citizens such as Mr. Atkinson. Dkt. 18, p. 2.

**B. The Defendants Have Acted In Bad Faith In Choosing To Censor Mr. Atkinson.**

As a threshold matter, Mr. Atkinson has pleaded that the Defendants have acted in bad faith. Compl. ¶ 31. He pleads multiple factual allegations that demonstrate that the Defendants acted in bad faith in censoring his posts naming Eric Ciaramella and echoing the thought that he was the Ukrainian whistleblower.

First, Mr. Atkinson alleges that the Defendants insisted on applying a vague "community standards" policy in "a politically-motivated, ideologically-driven way, silencing both right-wing and left-wing speech that threaten[ed] to disrupt the carefully crafted narrative around the attempt to impeach President Donald Trump." Compl. ¶ 30. The Defendants' motivations had nothing to do with whether Mr. Atkinson's speech was "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." The Defendants' motivations were purely political and ideological. There is no question that Mr. Ciaramella's role in the Ukrainian investigation was a matter of profound public interest for concerned citizens, but the Defendants insisted on censoring the mere mention of his name regardless of the context. Compl. ¶ 31. Consequently, the Defendants' purely political and ideological decisions to censor were made in bad faith.

Second, Mr. Atkinson alleges that the Defendants knew or should have known that Eric Ciaramella's name and connection with the Ukrainian investigation had already been made public on national television by Mollie Hemingway. Compl. ¶ 31. Millions of Americans knew of his connection to the Ukrainian investigation and his status as the whistleblower, and they were actively debating the merits of his allegations against President Donald Trump using his name. There was nothing socially taboo about mentioning Mr. Ciaramella's name, and Mr. Atkinson's posts and the posts of millions of

Americans that the Defendants censored posed no threat to Mr. Ciaramella's safety. The Defendants' decision to censor any posts that mentioned Mr. Ciaramella by name were purely political and ideological efforts to control the flow of information and perpetuate a political narrative. Consequently, the Defendants' decisions to censor Mr. Atkinson were made in bad faith.

Third, Mr. Atkinson alleges that the Defendants have revised their "community standards" to deflect attention from themselves and their practices of "surreptitiously mining data for profit from consumers who believe they are receiving a free service devoted primarily to their welfare." Compl. ¶ 35. The crafting of vague "community standards" leaves users like Mr. Atkinson with no guidance on what the Defendants consider to be objectionable or not. Rather, the vague standards enable the Defendants to change their findings of objectionability to suit whatever agenda that they need to carry out at a given time to deflect criticism and attention from their own missteps. Consequently, the Defendants' findings of objectionability are not made in good faith.

Fourth, the Defendants still have not provided a single communication to Mr. Atkinson on why his posts were removed. Compl. ¶ 29. Mr. Atkinson has not received a personalized communication, a canned explanation, a carrier pigeon that took six months to reach him, or any other form of communication. As the United States District Court for New Jersey wondered, "[o]ne would expect that if an interactive computer service had acted in good faith, it could and would come forward with the legitimate basis for its actions when questioned…." *Smith v. Trusted Universal Standards In Electronic Transactions, Inc.*, 2010 WL 1799456, at *7 (D.N.J. May 4, 2010). Mr. Atkinson did not even receive a courtesy notice that his posts had been removed. They just disappeared.

Compl. ¶¶ 26, 28. The Defendants' failure to provide Mr. Atkinson with any notice reflects their bad faith in censoring his posts.

## IV.    MR. ATKINSON'S STATE LAW CLAIMS DO NOT FAIL AS A MATTER OF LAW WITH THE EXCEPTION OF HIS FRAUD CLAIM.

### A.    Mr. Atkinson Concedes That He Did Not Allege Fraud With Sufficient Particularity, Apologizes To The Court And The Defendants For The Inconvenience, And Will Move To Amend His Complaint After The Court Rules On The Defendants' Motion To Dismiss.

Mr. Atkinson concedes that his claim of fraud does not meet the enhanced pleading requirements outlined by Federal Rule of Civil Procedure 9(b). To plead fraud, "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993). Mr. Atkinson concedes only that he has fallen short in alleging the first and third elements with sufficient specificity to meet the enhanced pleading requirements of Federal Rule of Civil Procedure 9(b). Mr. Atkinson does not concede that he has failed to state, or cannot state in any form, a valid claim of fraud on the merits.

Consequently, Mr. Atkinson concedes that, as a procedural matter, he did not allege fraud with sufficient particularity, apologizes to the Court and the Defendants for the inconvenience, and represents that he will move the Court for permission to amend his complaint after the Court rules on the Defendants' Motion to Dismiss.

### B.    Mr. Atkinson Alleges Sufficient Facts To Sustain His CUPTA Claim, And The Lack Of Physical Damages Does Not Mean That Mr. Atkinson Has Not Suffered An Ascertainable Loss.

The Defendants seek to escape liability under the Connecticut Unfair Trade Practices Act (CUTPA) on the grounds that Mr. Atkinson did not allege sufficient facts or an ascertainable loss. They err by not carefully considering Mr. Atkinson's complaint.

To prevail on a CUPTA violation, a plaintiff must show (1) "a representation, omission or other practice likely to mislead consumers;" (2) "consumers must interpret the message reasonably under the circumstances;" and (3) "the misleading representation, omission, or practice must be material – that is, likely to affect consumer decisions or conduct." *Caldor, Inc. v. Heslin*, 215 Conn. 590, 597 (1990) (internal quotations and citations omitted).

In his CUPTA claim, Compl. ¶ 65-66, Mr. Atkinson incorporates the factual allegations of all previous paragraphs, which also support his CUTPA claim. Compl. ¶ 65. As to the first element, Mr. Atkinson alleged that "[t]he Defendants hold themselves out to the world as fostering a means by which the people of the world can communicate with one another." Compl. ¶ 54. Mr. Atkinson further alleges "[t]he Defendants further represent that they will foster communication without censorship of participants based on the content of the participants' ideas and opinions." Compl. ¶ 55. Mr. Atkinson also alleges that "[t]he Defendants encouraged and/or solicited the Plaintiff[] to use Facebook…." Compl. ¶ 63(a). These representations were likely to mislead consumers such as Mr. Atkinson as to the exact nature of the Defendants' business offerings by portraying the Defendants as champions of free speech and a platform for uncensored intellectual expression.

As the second element, Mr. Atkinson alleges that he interpreted the Defendants' representations reasonably under the circumstances. Mr. Atkinson did not interpret their

message as licensing him to engage in excessive profanity or post pictures of himself buck naked on Facebook. He also did not interpret their message as giving him unbridled licensure to post blood and gore pictures. What he did interpret their representations to mean is that he would have the ability to freely post his political opinions on Facebook. Based on the Defendants' representations, Mr. Atkinson did interpret their message reasonably.

As to third element, Mr. Atkinson does allege that the Defendants' representations were material as they allured him to "establish and contribute web traffic on its platform…." Compl. ¶ 64. Without such representations of offering a platform that Mr. Atkinson believed would allow him to express his political beliefs freely, Mr. Atkinson would not have signed up for the Defendants' service and built his intellectual friendships on Facebook. Compl. ¶¶ 20, 63(a).

Finally, Mr. Atkinson has alleged an ascertainable loss that is "capable of being discovered, observed or established." *Hinchliffe v. American Motors Corp.*, 184 Conn. 607, 613 (1981) (internal quotation marks omitted). He has a property interest in his data that he gave the Defendants' certain limited rights to in exchange for his free use of Facebook. Compl. ¶¶ 10, 35, 46-47, 56-57, 63(b), 64. If he can prevail on his CUTPA violation, Mr. Atkinson is entitled to recover the value of the data that the Defendants have taken from him.

Consequently, the Court should deny the Defendants' motion to dismiss Mr. Atkinson's CUTPA claim.

### C.  Mr. Atkinson Alleges Sufficient Facts To Sustain His Claim For Breach Of The Implied Warranty of Good Faith And Fair Dealing.

In his breach of implied warranty claim, Compl. ¶ 67-70, Mr. Atkinson incorporates the factual allegations of all previous paragraphs, which also support his breach of implied warranty claim. Compl. ¶ 67.

"A duty of good faith and fair dealing is implied into every contractual relationship, and it requires that neither party do anything to injure the other's right to receive the benefits of the contract." *Landry v. Spitz*, 102 Conn. App. 34 (2007). The benefit that Mr. Atkinson received by virtue of his contract with the Defendants was the free use of Facebook for purposes of free and open communication with others. Compl. ¶¶ 10, 35, 46-47, 56-57, 63(b), 64, 68. Mr. Atkinson relied on the Defendants' representations to his detriment, and Mr. Atkinson alleges that the Defendants unilaterally changed the terms of their contract with him. Compl. ¶¶ 69-70.

Mr. Atkinson also alleges that the Defendants insisted on applying a vague "community standards" policy in "a politically-motivated, ideologically-driven way, silencing both right-wing and left-wing speech that threaten[ed] to disrupt the carefully crafted narrative around the attempt to impeach President Donald Trump." Compl. ¶ 30. The Defendants' motivations had nothing to do with whether Mr. Atkinson's speech was inappropriate based on objective standards of decency. The Defendants' motivations were purely political and ideological. Consequently, the Defendants' purely political and ideological decisions to censor were made in bad faith, and their actions breached the implied warranty of good faith and fair dealing.

Consequently, the Court should deny the Defendants' motion to dismiss Mr. Atkinson's claim for breach of the implied warranty of good faith and fair dealing.

## V.   MARK ZUCKERBERG IS AN APPROPRIATE PARTY UNDER THE "PIERCING THE CORPORATE VEIL" DOCTRINE.

Under Connecticut law, a plaintiff may pierce the corporate veil to impose liability on the real actor in situations where "the corporate entity has been so controlled and dominated that justice requires liability to be imposed on the real actor." *Tucker v. American Intern. Group, Inc.*, 745 F. Supp.2d 53 (D.Conn. Sept. 30, 2010) (quoting *Naples v. Keystone Building and Development Corp.*, 295 Conn. 214, 231 (2010)). The Connecticut Supreme Court employs two separate tests for piercing the corporate veil: "the 'instrumentality' test; and (2) the 'identity' test." *Id.* at 70 (citing *Angelo Tomasso, Inc., v. Armor Const. & Paving, Inc.*, 187 Conn. 544 (1982); *Naples v. Keystone Bldg. and Development Corp.*, 295 Conn. 214 (2010)). Mr. Atkinson alleges sufficient facts to pierce the corporate veil under the instrumentality test.

It is well-established that a Plaintiff must prove three elements to prevail under the instrumentality test:

> (1) control by the parent of the finances, policies and business practices relating to the transaction at issue to such an extent that the subsidiary "had at the time no separate mind, will or existence of its own"; (2) that the parent exercised that control over the subsidiary in order to commit a fraudulent, wrongful, or otherwise unlawful act; and (3) the control and breach of duty must have proximately caused the plaintiff's injury.

*Id.* at 70; *see also Naples*, 295 Conn. at 231-33.

Mr. Atkinson satisfies the first element in that he alleges that Mark Zuckerberg owns a controlling interest in Facebook's stock, thus rendering the other shareholders powerless to disagree with him. Compl. ¶ 5. Mr. Atkinson also alleges that Mr. Zuckerberg is the Chairman and Chief Executive Officer of Facebook, Inc, which gives him sole, direct, and final control over the company's finances, policies, and business practices related to the transaction at hand. Compl. ¶ 5.

As to the second element, Mr. Atkinson has alleged that Mr. Zuckerberg has held himself and Facebook, Inc. out to the world as a means of communication where participants will not be censored based on the content of their ideas and opinions. Compl. ¶¶ 54-55, 65-69. Mr. Atkinson has subsequently alleged that Mr. Zuckerberg engaged in fraud and deception by holding the Defendants out to the world as promoters of free expression to entice and attract users to his technologies while simultaneously selectively censoring speech. Compl. ¶¶ 61-62, 65-69. Mr. Zuckerberg committed this fraud and deception by using his total control over Facebook to accomplish it.

As to the third element, Mr. Atkinson has alleged that Mr. Zuckerberg's total control over Facebook, Inc. has resulted in the Defendants' breach of its duty of honesty and good faith to him. Mr. Atkinson has alleged multiple unlawful actions on the Defendants' part, and he has alleged that Mr. Zuckerberg had total control over them. Compl. ¶ 5.

Consequently, while it might be an open question as to whether Mr. Atkinson can ultimately prevail on his claims against Mr. Zuckerberg, he has alleged enough facts for the Court to allow him to pierce the corporate veil and state claims against Mr. Zuckerberg.

## VI.    THE COURT SHOULD REJECT THE DEFENDANTS' INVITATION TO TRANSFER THIS CASE TO THE NORTHERN DISTRICT OF CALIFORNIA.

"The overriding framework governing the effect of forum selection clauses in federal courts… is drawn from federal law." *Martinez v. Bloomberg LP*, 740 F.3d 211, 217 (2d Cir. 2014). At this time, Mr. Atkinson does not contest that the forum selection clause was reasonably communicated as a matter of law, that it is mandatory, and that the clause would subject his claims to it, thus making the forum selection clause "presumptively enforceable." *Philips v. Audio Active Ltd*, 494 F.3d 378, 383 (2d Cir. 2007). However,

determining whether a forum selection clause is enforceable is a matter of federal law, not state law. *Id.* at 384 (citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)); *see also Aguas Lenders Recovery Group v. Suez, S.A.*, 585 F.3d 696, 700 (2d Cir. 2009); *Jones v. Weibrecht*, 901 F.2d 17, 19 (2d Cir.1990) (per curiam); *AVC Nederland B.V. v. Atrium Inv. P'ship*, 740 F.2d 148, 156 (2d Cir.1984). Consequently, Mr. Atkinson can overcome the presumption of enforceability by "making a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Id.* at 383-84 (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972) (internal quotations omitted).

"Federal law must govern the ultimate enforceability of a forum selection clause to ensure that a federal court may decline to enforce a clause 'trial in the contractual forum [would] be so gravely difficult and inconvenient that [the resisting party] will for all practical purposes be deprived of his day in court….'" *Martinez*, 740 F.3d at 218 (quoting *Bremen*, 407 U.S. at 18). As he identifies in his sworn affidavit attached as "**Exhibit A**," Mr. Atkinson is a law student and possesses limited financial means. He is being represented pro bono in this matter, and he will have tremendous difficulty in locating a pro bono local counsel in the Northern District of California. **Exhibit A**, ¶¶ 5-6. If he is unable to locate pro bono local counsel, he will be forced to withdraw his lawsuit without reaching the merits of his claims. **Exhibit A**, ¶ 7. Furthermore, transferring this action to the Northern District of California will effectively deny Mr. Atkinson the opportunity to attend any court hearings in this matter and place overwhelming financial burdens on the undersigned because of the prohibitively expensive costs of airfare and lodging to, from, and in California. **Exhibit A**, ¶ 8.

In other words, the transfer of this action to the Northern District of California will effectively operate as a dismissal of Mr. Atkinson's lawsuit without ever reaching the merits because he lacks the financial means to sustain such a lawsuit so far from his home and the location of his counsel. As much as the Defendants would relish such an outcome, this is the precise sort of grave difficulty and inconvenience that the United States Supreme Court and the Second Circuit have instructed the district courts to prevent. Consequently, the Court should deny the Defendants' motion to transfer this case to the United States District Court for the Northern District of California.

## Conclusion

For the foregoing reasons, the Plaintiff respectfully requests the Court to deny the Defendants' motion to dismiss in its entirety and to retain jurisdiction over this matter.

THE PLAINTIFF


By: /s/ NORMAN A. PATTIS /s/
      NORMAN A. PATTIS
      PATTIS & SMITH, LLC
      383 Orange Street
      New Haven, CT 06511
      203.393.3017
      203.393.9745
      npattis@pattislaw.com
      ct13120

## CERTIFICATE OF SERVICE

I hereby certify that on March 12, 2020, I filed a copy of the foregoing electronically and served a copy of the foregoing by mail on anyone unable to accept electronic filing. The Court's electronic filing system will send notice of this filing by e-mail to all parties. Parties may access this filing through the Court's CM/ECF System.

/s/ NORMAN A. PATTIS /s/
NORMAN A. PATTIS

# Exhibit A

UNITED STATED STATES DISTRICT COURT<br>DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CAMERON L. ATKINSON, | : | |
| | : | |
| Plaintiff, | : | 3:19-CV-01785-JCH |
| | : | |
| v. | : | |
| | : | |
| FACEBOOK, INC., | : | |
| MARK ZUCKERBERG, | : | |
| Defendants. | : | March 12, 2020 |

## SWORN AFFIDAVIT OF MR. CAMERON L. ATKINSON

Cameron L. Atkinson, having been duly sworn, does depose and state:

1. I am over the age of 18 and understand and believe in the obligation of an oath.

2. The facts set forth herein are within my personal knowledge.

3. I am the Plaintiff in this case.

4. I am a third-year law student at Quinnipiac University School of Law.

5. I possess extremely limited financial means, and I am being represented pro bono in this matter in addition to contributing substantial amounts of my own personal time to working on this matter.

6. I cannot afford to retain local counsel in the Northern District of California, and finding another lawyer to serve as local counsel on a pro bono basis in the Northern District of California will be extremely difficult due to the novel federal claims that I seek to advance and the general uncertainty surrounding whether my state law claims are barred by federal statute.

7. If I am unable to find pro bono local counsel in the Northern District of California, I will likely be compelled to withdraw my suit without having a chance to reach the merits of my claims.

8.   Moreover, a transfer to the Northern District of California will effectively deny me the opportunity to attend any court hearings in this matter because of the prohibitively expensive costs of airfare and lodging to, from, and in California.

9.   For these reasons, I respectfully request that the Court deny the Defendants' motion to transfer this action to the Northern District of California.

SIGNED _Cameron L. Atkinson_
Cameron L. Atkinson

Duly sworn to and subscribed before me this 12th day of March, 2020.

Notary Public

Donna L. Peat
Notary Public - Connecticut
My Commission Expires
January 31, 2023