## UNITED STATED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CAMERON L. ATKINSON, | : | |
| | : | |
| Plaintiff, | : | 3:19-CV-01785-JCH |
| | : | |
| v. | : | |
| | : | |
| FACEBOOK, INC., | : | |
| MARK ZUCKERBERG, | : | |
| Defendants. | : | July 3, 2020 |

## <u>PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO SUPPLEMENTAL RULE 12 MOTION</u>

The Plaintiff, Cameron L. Atkinson, respectfully requests the Court to deny the Defendants' motion to dismiss his supplemental complaint for the reasons set forth within.

Confronted by far more serious allegations that pose a threat both to their brand and the false sense of legal security that they enjoy, the Defendants contort the well-established motion to dismiss standard into a different, self-serving standard. They also misconstrue Mr. Atkinson's complaint to paint his allegations as entirely implausible. In other words, they have attempted to create the case that they want to defend rather than paying sober attention to the case that they are defending.

It is small wonder that the Defendants have censored Mr. Atkinson again. They openly admitted coordinating the censorship of political speech with state and local governments. When Mr. Atkinson sought to express his opinion that they were engaged in impermissible coordination, they sought to silence him to cover up their blunder.

The Court should deny the Defendants' motion to dismiss Mr. Atkinson's supplemental complaint because a fair reading of it under the well-established motion to

**Oral Argument Not Requested**

dismiss standard indicates that Mr. Atkinson has alleged sufficient plausible allegations to survive a motion to dismiss.

## PROCEDURAL BACKGROUND

Mr. Atkinson filed this action on November 12, 2019, stating claims against the Defendants for violating his First Amendment rights, violating the Communications Decency Act, fraud, breach of the implied warranty of fair dealing, and violations of the Connecticut Unfair Trade Practices Act (CUPTA). **Dkt. 1**. After briefing had been completed on the Defendants' motion to dismiss, the Defendants chose to censor Mr. Atkinson again, and he moved the court for permission to file a supplemental complaint. **Dkt. 46**. The Court granted Mr. Atkinson's motion on May 21, 2020, and he filed his supplemental complaint on May 22, 2020. **Dkt. 47, 48.**

## Argument

A plaintiff must plead "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, the plain statement must allege sufficient facts to state a plausible claim for relief. *Monger v. Connecticut Dept. of Transportation*, 2017 WL 3996393, at *2 (D. Conn., Sept. 11, 2017) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at *2 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (internal quotations omitted). This plausibility standard does not require a probability analysis, but it also is not met by "'a sheer possibility that a defendant has acted

unlawfully' or by facts that are 'merely consistent with a defendant's liability.'" *Id*. at *2 (quoting *Iqbal*, 556 U.S. at 678).

For purposes of deciding a Rule 12(b)(6) motion, "the court must accept all material factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Id*. at *2 (citing *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 5 (2010); *Jaghory v. N.Y. State Dept. of Education*, 131 F.3d 326, 329 (2d Cir. 1997)). However, this does not require the court to "accept as true a 'legal conclusion couched as a factual allegation.'" *Id*. at *2 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

I.   **THE DEFENDANTS' ARGUMENTS THAT MR. ATKINSON'S SUPPLEMENTAL COMPLAINT IS FACTUALLY DEFICIENT FAIL BECAUSE THEY RELY ON A BIASED CONSTRUCTION OF HIS SUPPLEMENTAL COMPLAINT.**

The Defendants ask the Court to construe Mr. Atkinson's supplemental complaint in two ways that are not readily apparent from the face of the complaint. First, the Defendants ask the Court to construe Mr. Atkinson's allegations as solely alleging that they have been actively coordinating with state and local governments to censor protests against COVID-19 restrictions. Second, they ask the Court to find that Mr. Atkinson's allegations are factually implausible and infer a technological error instead of the misconduct that Mr. Atkinson plainly alleged. Neither argument can succeed under the well-established standard for reviewing a motion to dismiss.

### A.   Mr. Atkinson's Supplemental Complaint Clearly Does Not Adopt The Exhibit's Factual Version Of The Defendants' Conduct.

Mr. Atkinson did not adopt CNN's interpretation of the Defendant's actions as the factual basis for his supplemental complaint. He most certainly did not adopt the Defendants' interpretation of their actions as the factual basis for his complaint. Nevertheless, the Defendants ask the Court to adopt their view that Mr. Atkinson adopted

CNN's and their interpretations of their actions by attaching to his supplemental complaint an exhibit containing a CNN article. **Dkt. 51-1, pp. 3-4**; *see also* **Dkt. 48, Exhibit A**. Mr. Atkinson did no such thing.

First, Mr. Atkinson attached the CNN story as an exhibit to his supplemental complaint for the Court's convenience, namely, to identify the story that he read and that inspired his blog post. **Dkt. 48, ¶¶ 10-12**. It is simply not possible to construe Mr. Atkinson's supplemental complaint as adopting the Defendant's version of the events contained in the Exhibit without violently contorting Mr. Atkinson's supplemental complaint.

Second, even if Mr. Atkinson did adopt the Defendants' account of the events described in the Exhibit, the Exhibit indicates that the Defendants were actively "Working to get answers from state governments in Wisconsin, Ohio, Pennsylvania, and New York as to whether anti-stay-at-home protests are also prohibited under their social distancing guidelines." **Dkt. 48, Exhibit A, p. 3.** The mere fact that a few state governments denied a direct cooperation with the Defendants is irrelevant for the nature of the relationship between the Defendants and the other state governments that they reached out to. Consequently, Mr. Atkinson's allegations are not affirmatively contradicted by Exhibit A of the Supplement Complaint.

Third, both the Defendants' and state governments' denials are merely opinions as to the nature of the interactions that occurred between them. The Defendants and the state governments that commented have a vested interest in not confessing to the entire United States of America that they trod all over the First Amendment rights of millions of people. There is also no indication that the Defendants made any effort to reach out to

shut down the organization of Black Lives Rally marches on Facebook while the same COVID-19 restrictions were still in place. Consequently, the Defendants ask the Court to ignore Mr. Atkinson's allegations and adopt their opinions despite the fact that their statements do not affirmatively contradict his allegations.

The Court should decline to do so.

### B. Mr. Atkinson's Claim That The Defendants Deliberately Removed His Blog Post From Facebook Is Not Factually Deficient Because The Defendants Omitted Key Factual Allegations In Their Arguments.

The Defendants boldly declare that the allegations contained in Mr. Atkinson's supplemental complaint are implausible. **Dkt. 51-1, pp. 4-6**. They seek to recast their censorship of Mr. Atkinson – something that he clearly alleged – into an alternative explanation of a technical error. *Id.* **at 5**. In doing so, they present the Court with a truncated version of facts, crucially omitting any mention of Mr. Atkinson's repeated attempts to publish his ideas on Facebook.

Mr. Atkinson clearly alleges that he authored and published a blog post for his personal website entitled "I Sued Facebook For Coordinating Speech Censorship With Governments. Today, They Admitted It." **Dkt. 48, ¶ 12**. He further alleges that, as was his custom, he shared his blog post on LinkedIn, Twitter, and Facebook and that LinkedIn and Twitter both published his posts sharing his article. *Id.* at ¶ 13. He further alleges that the Defendants did not publish his article. *Id.* at ¶ 14.

Mr. Atkinson then alleges that he made no fewer than seven attempts to share his blog post to his Facebook page. *Id.* at ¶ 15. He explains his repeated attempts as giving the Defendants the initial benefit of the doubt due to a technical error (i.e. a faulty internet connection). *Id.* at ¶ 15. However, he further alleges that, on several of his attempts, he

received a confirmation screen from the Defendants stating that his post had been successfully shared. *Id*. at ¶ 16. Despite the Defendants' confirmation that the act of sharing had been successful, Mr. Atkinson's blog post was never shared to his Facebook page. *Id*. at ¶¶ 15-16.

Mr. Atkinson's allegations are clear. The Defendants immediately censored his post through an algorithm solely based on its title – an algorithmic determination that they created to mitigate a legal, public relations, and business blunder of epic proportions. *Id*. at ¶¶ 17-23. Consequently, even though Mr. Atkinson offers an explanation for his initial attempts to reshare the article, the Defendants' claim that he concedes a technical failure by such an explanation cannot explain why they confirmed that his post was shared successfully to his Facebook page. The Defendants do not offer any factual elaborations to the Court to explain their claimed technical failure.

Mr. Atkinson's allegations of repeated attempts to share his post to Facebook and multiple confirmations from the Defendants that his post was shared successfully do not render his allegation of censorship implausible. Therefore, the Court should reject the Defendants' cursory reading of his supplemental complaint and find that it is factually sufficient in its entirety.

## II.    MR. ATKINSON'S CLAIMS DO NOT FAIL AS A MATTER OF LAW.

The Defendants relied on their original motion to dismiss for their arguments against Mr. Atkinson's supplemental complaint, contenting themselves with a summary of their application to his new claims. **Dkt. 51-1, p. 6**. Mr. Atkinson does not disagree that many of the same principles contained in the briefing on the original motion to dismiss govern, and he reincorporates his legal arguments from his response to the Defendants'

original motion to dismiss for the Court's convenience. He briefly discusses their application to his new claims.

**A. The Court Should Not Dismiss Mr. Atkinson's First Amendment Claim Because The Public Function Exception & The Entwinement Exception To The State Action Doctrine Both Apply.**

**1. Social networks such as the defendants' closely resemble the public spaces that the Supreme Court recognized under through the public function exception and the public forum doctrine.**

In *Marsh v. Alabama*, the Supreme Court held that a private company operating a company town was subject to the First Amendment, explaining that its private property rights did not "justify the State's permitting a corporation to govern a community of citizens so as to restrict their fundamental liberties…." 326 U.S. 501, 509 (1946). The *Marsh* Court found that the company town was no different from any other public town "except [for] the fact that the title to the property belong[ed] to a private corporation," thus implying that a private company could conceivably possess the power to undermine freedom as effectively as a government could. *Id*. at 503. Second, the *Marsh* Court rationalized that the town was freely accessible by the public, thus serving a public function of the kind traditionally served by a government. *Id.* at 503-506 ("The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it"). Third, the *Marsh* Court found that applying First Amendment rights against a private company was necessary because, at the time, "[m]any people in the United States live[d] in company-owned towns," and "to act as good citizens they must be informed," and "[i]n order to enable them to be properly informed their information must be uncensored." *Id*. at 508.

The Supreme Court since has significantly narrowed *Marsh* in *Jackson v. Metro Edison Co*., 419 U.S. 345, 352 (1974) to public functions that are both "traditionally" and "exclusively" provided by the State.. These traditional and exclusive public functions appear to be now limited to "bridges, ferries, turnpikes and railroads," *Marsh*, 326 U.S. at 506; operating public parks, *Evans v. Newton*, 382 U.S. 296, 301-302 (1966); or providing for education, fire and police protection, and tax collection, *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 163-64 (1978).

Even under the narrower version of *Marsh*, the Defendants' social network, Facebook, can still be viewed, and should be viewed, as a state actor. Social networks such as Facebook do serve an important public function: providing a space with the primary purpose of serving as a forum for public communication and expression[1], designating that space for that purpose, and completely opening that space to the public[2]. In other words, social network websites are akin to public squares and meeting places. Indeed, unlike the shopping malls in the now-reversed *Amalgamated Food Emps. Union Local 590 v. Logan Valley Plaza*, 391 U.S. 308, 325 (1968) and its progeny, which were dedicated primarily to shopping and commerce instead of being a forum for speech, social

---

[1] Communications on social network websites such as Facebook are not necessarily fully public as Facebook offers users the ability to limit who is able to receive particular messages, as well as the ability to send private messages, and listeners can choose from whom they wish to hear. However, public town spaces are often no different. No one would fail to label a town square as a "public place" just because an individual walking in the square could choose to ignore a speech being made there, or because that individual was able to have a private conversation with another individual in the square.

[2] *See Marsh*, 326 U.S. at 506 ("The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it.").

networks are designed and designated for communication and speech just like town squares traditionally were.

Governments traditionally and always managed public squares and meeting places; therefore, under *Marsh*'s rationale even in its narrowed context, social networks such as Facebook fulfill a public function that traditionally has been the sole province of the state, and it gives Facebook a quasi-monopolistic and exclusive control. Compl. ¶ 46. The sheer size of the public square maintained by Facebook is unparalleled in human history. In the past, only government were able to offer spaces that could accommodate tremendous numbers of people even though their efforts now pale in comparison to social media networks. Consequently, social media networks serve a function previously fulfilled exclusively by the government.

### 2. Mr. Atkinson Has Alleged An Entwinement Between The Defendants And State Governments Sufficient To Invoke The Entwinement Exception To The State Action Doctrine.

The Supreme Court has held that a non-state actor may be deemed a state actor "because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937 (1982); *see also Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (citation omitted) ("[S]tate action may be found ... only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'"); *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 724 (1961). Therefore, "private conduct must comply with the Constitution if the government has authorized, encouraged, or facilitated the unconstitutional conduct." Erwin Chemerinsky, Constitutional Law 519-21 (4th ed. 2011).

Mr. Atkinson previously alleged an impermissible entwinement between the federal government and the Defendants; however, he now also alleges a similar and more overt entwinement between the Defendants and state governments. State governments took extraordinary measures in the name of preventing the spread of coronavirus. In doing so, they prohibited all assemblies including for the purpose of protesting their encroachments on constitutionally guaranteed liberties to freedom of speech and freedom of assembly. The Defendants did not remain idle. At best, they reached out to state and local governments to ascertain the precise nature of these assemblies for engaging in protected political speech and censor any efforts at coordinating them. **Dkt. 48**, **¶¶ 10-11**. At worst, the Defendants are doing state governments' dirty work by censoring political speech that the state governments find politically inconvenient. *Id*.

Mr. Atkinson clearly alleged that the Defendants were actively engaging in such a coordination with state governments, which would render them a state actor under the entwinement exception. ***Id*. at ¶¶ 10-11**. Despite the Defendants' reference to the states that denied requesting them to censor anything, their denials do not cover all of the states that the Defendants appear to have coordinated with. Common sense also dictates that the states' denials cannot be given the presumption of truth as they would hardly admit that they blatantly violated the First Amendment and conspired with a so-called private actor to conceal their violations. Mr. Atkinson also alleged that the Defendants' censorship of his blog post was to cover up their actions in entwining themselves with state governments and forfeiting any defense that they are not a state actor. *Id*. at ¶¶ 21, 23. Furthermore, Mr. Atkinson alleged, and the Defendants provide no evidence to rebut, that they lacked a good faith basis to censor his post even under their opaque community

standards. *Id*. at ¶¶ 20-21. In other words, the Defendants have been caught with their hands in the proverbial cookie jar, and they cannot risk what discovery might reveal.

No matter how much the Defendants seek to paint themselves as entirely innocent and Mr. Atkinson as a deranged lunatic who jumped to conclusions, Mr. Atkinson has supplied sufficient and plausible allegations to satisfy the entwinement exception, and the Court should deny the Defendants' motion to dismiss his First Amendment claims. If the Defendants are as innocent as they claim to be, they will have no trouble in disposing of Mr. Atkinson's claims in a summary judgment motion after discovery.

## B.  47 U.S.C. § 230 CREATES A CONSTRUCTIVE PUBLIC TRUST REQUIRING THE DEFENDANTS TO ALIGN WITH THE GOVERNMENT'S OBJECTIVE IN PROMOTING FREE SPEECH ON THE INTERNET IN EXCHANGE FOR IMMUNTY.

Rather reembarking on a repetitive discussion, Mr. Atkinson hereby reincorporates his arguments regarding § 230's creation of a constructive public trust in his reply to the Defendants' original motion to dismiss in their entirety for purposes of responding to the Defendants' arguments in the instant motion.

## C.  THE COMMUNICATIONS DECENCY ACT DOES NOT AUTOMATICALLY PRECLUDE THE PLAINTIFF'S STATE LAW CLAIMS BECAUSE THE DEFENDANTS DID NOT ACT IN GOOD FAITH OR VOLUNTARILY.

Contrary to their view, 47 U.S.C. § 230(c) does not provide the Defendants with absolute immunity, and it does not relieve them of all responsibility. First, § 230(c) immunity is an affirmative defense, which Mr. Atkinson is not required to prospectively disprove in his complaint. *See e-ventures Worldwide, LLC v. Google, Inc.*, 188 F. Supp. 3d. 1265, 1273 (M.D. Fla. 2016). Second, § 230 specifically allows state law claims that are not inconsistent with the rest of § 230. 47 U.S.C. § 230(e)(3).

§ 230(c)(2) expressly provides:

No provider or user of an interactive computer service shall be held liable on account of – (A) any action *voluntarily taken in good faith* to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected….

47 U.S.C. § 230(c)(2) (emphasis added).

The statutory immunity provided under § 230 "does not apply without limitation." *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006). If it is readily apparent from the face of a complaint that a plaintiff has pled no claims or facts supporting an allegation of a lack of good faith, a defendant may invoke § 230 immunity during a motion to dismiss. *e-ventures Worldwide, LLC,* 188 F. Supp. 3d. at 1273. However, if a plaintiff pleads a lack of good faith and sufficient factual allegations to support a lack of good faith, § 230 immunity does not apply at the motion to dismiss stage. *Id.* at 1273; *see also Smith v. Trusted Universal Standards in Electronic Transactions, Inc.*, 2010 WL 1799456 (D.N.J. May 4, 2010).

Mr. Atkinson has alleged that the Defendants have not censored him in good faith, and he has alleged sufficient facts to support such an allegation as well. Not only does he allege that the Defendants censored his post – *see* **Dkt. 48, ¶¶ 14-17, 21, 23** – but he also alleges that the Defendants did so without viewing his article, either with a human agent or an artificial intelligence agent, or making any good faith effort to review whether his post or his article complied with their vague community standards. ***Id.* at ¶ ¶17-20**. Mr. Atkinson alleged that the Defendants censored Mr. Atkinson's post solely based on its title, which raised the possibility that they had conspired with state governments to censor political speech and represented a legal, public relations, and business blunder of epic

proportions. *Id.* at **¶¶ 21, 23**. Consequently, in other words, Mr. Atkinson alleges that the Defendants did not censor his post for failing to comply with their vague community standards, that they did not even attempt to determine if it complied, and that they censored it for entirely self-serving reasons.

For parties who hold themselves out to the world as promoters of free expression and facilitators of human communication, the Defendants' actions cannot possibly be characterized as being taken in good faith. Therefore, the Court should deny their motion to dismiss Mr. Atkinson's claims on the basis of their claimed 47 U.S.C. § 230 immunity and find that Mr. Atkinson has alleged sufficient facts to support bad faith.

### D. Mr. Atkinson Alleges Sufficient Facts To Sustain His CUPTA Claim, And The Lack Of Physical Damages Does Not Mean That Mr. Atkinson Has Not Suffered An Ascertainable Loss.

Rather reembarking on a repetitive discussion, Mr. Atkinson hereby reincorporates his arguments regarding his CUPTA claim in his reply to the Defendants' original motion to dismiss in their entirety for purposes of responding to the Defendants' arguments in the instant motion.

### E. Mr. Atkinson Alleges Sufficient Facts To Sustain His Claim For Breach Of The Implied Warranty of Good Faith And Fair Dealing.

Rather than make a formal request for Rule 11 sanctions because they undoubtedly realize that such a request would be frivolous, the Defendants content themselves with arguing that Mr. Atkinson lacked a good faith basis under Rule 11 from alleging that the Defendants breached the implied warranty of good faith and fair dealing "to conceal their shady dealings with governments to censor speech." **Dkt. 51-1, p. 10-11**. Mr. Atkinson's supplemental complaint flatly contradicts both their construction of his claim and their allegations of bad-faith pleading.

"A duty of good faith and fair dealing is implied into every contractual relationship, and it requires that neither party do anything to injure the other's right to receive the benefits of the contract." *Landry v. Spitz*, 102 Conn. App. 34 (2007). The benefit that Mr. Atkinson received by virtue of his contract with the Defendants was the free use of Facebook for purposes of free and open communication with others. **Dkt. 1, ¶¶ 10, 35, 46-47, 56-57, 63(b), 64, 68**. Mr. Atkinson relied on the Defendants' representations to his detriment, and Mr. Atkinson alleges that the Defendants unilaterally changed the terms of their contract with him. **Dkt. 1, ¶¶ 69-70**.

Mr. Atkinson clearly alleges that the Defendants were actively coordinating with state governments to censor political speech, namely, anti-COVID-19 shutdown restriction protests. **Dkt. 48, ¶¶ 10-11**. He also alleges that he sought to express his opinion that they were doing so and that they completely censored his attempt to do so. *Id*. at ¶¶ 14-23. Mr. Atkinson alleges that they did so to conceal their own blunder and mitigate self-inflicted damages without even considering whether his speech violated any of their vague community standards. *Id*. at ¶¶ 20, 23. The Defendants' conduct was entirely self-serving to the detriment of Mr. Atkinson, and it is no implausible allegation to state that they did so "to conceal their shady dealings with governments to censor speech." *Id*. at 46.

Consequently, the Court should deny the Defendants' motion to dismiss Mr. Atkinson's claim for breach of the implied warranty of good faith and fair dealing.

## III.   MARK ZUCKERBERG IS AN APPROPRIATE PARTY UNDER THE "PIERCING THE CORPORATE VEIL" DOCTRINE.

Rather reembarking on a repetitive discussion, Mr. Atkinson hereby reincorporates his arguments regarding "piercing the corporate veil" in his reply to Mr. Zuckerberg's

original motion to dismiss in their entirety for purposes of responding to the Defendants' arguments in the instant motion.

## IV.    THE COURT SHOULD REJECT THE DEFENDANTS' INVITATION TO TRANSFER THIS CASE TO THE NORTHERN DISTRICT OF CALIFORNIA.

For the same reasons discussed in his response to the Defendants' original motion to transfer jurisdiction, Mr. Atkinson respectfully requests that the Court retain jurisdiction over this matter.

## Conclusion

For the foregoing reasons, the Plaintiff respectfully requests the Court to deny the Defendants' motion to dismiss his supplemental complaint in this matter and to retain jurisdiction over this matter.

THE PLAINTIFF

By: /s/ NORMAN A. PATTIS /s/
NORMAN A. PATTIS
PATTIS & SMITH, LLC
383 Orange Street
New Haven, CT 06511
203.393.3017
203.393.9745
npattis@pattislaw.com
ct13120

## CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2020, I filed a copy of the foregoing electronically and served a copy of the foregoing by mail on anyone unable to accept electronic filing.

The Court's electronic filing system will send notice of this filing by e-mail to all parties.

Parties may access this filing through the Court's CM/ECF System.

/s/ NORMAN A. PATTIS /s/
NORMAN A. PATTIS